J-S24029-18 & J-S24030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONOVON NEAL LEE, | : | |
| | : | |
| Appellant | : | No. 1526 MDA 2017 |

Appeal from the Judgment of Sentence, May 24, 2017,
in the Court of Common Pleas of Franklin County,
Criminal Division at No(s): CP-28-CR-0000474-2015.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONOVON NEAL LEE, | : | |
| | : | |
| Appellant | : | No. 1527 MDA 2017 |

Appeal from the Judgment of Sentence, May 24, 2017,
in the Court of Common Pleas of Franklin County,
Criminal Division at No(s): CP-28-CR-0000475-2015.

BEFORE:  OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JULY 17, 2018**

Donovan Neal Lee appeals from the judgment of sentence entered following his convictions for indecent assault[1] and corruption of a minor.[2]  Lee contends that the trial court erred in denying his claim that the verdict was

---

[1] 18 Pa.C.S.A. § 3126.
[2] 18 Pa.C.S.A. § 6301(a)(1)(ii).

against the weight of the evidence. Upon review, we affirm the trial court's decision, but vacate that portion of Lee's sentence designating him a sexually violent predator (SVP).

Lee's convictions resulted from acts he perpetrated on two of his female relatives. Lee is C.M.'s uncle. When C.M. was three or four years old, Lee began sexually assaulting her. This continued until C.M. was in fourth or fifth grade. Her family did not learn of Lee's actions until C.M. was almost twelve.

Lee is W.B.'s cousin. When W.B. was five years old, Lee sexually assaulted W.B. This incident, which was discovered immediately, occurred around the same time that it was discovered that Lee had been sexually assaulting C.M.

The incidents with both girls were investigated and charges filed against Lee under Docket Nos. CP-28-CR-0000474-2015 and CP-28-CR-0000475-2015 respectively. By order of court, C.M. and W.B.'s cases were tried together before a jury on December 5 and 6, 2016. The trial court aptly summarized the testimony and evidence presented at trial in its September 8, 2017 Opinion, which we incorporate as though fully set forth herein.

The jury found Lee guilty of one count of indecent assault and one count of corruption of a minor at docket number 474-2015 for offenses committed against his niece, C.M. Additionally, the jury found Lee guilty of one count of indecent assault and one count of corruption of a minor at docket number 475-2015 for offenses committed against his cousin, W.B. After an

evidentiary hearing, Lee was determined to be a sexually violent predator.  He was sentenced to an aggregate period of incarceration of 25 years to 50 years.  The trial court entered a sentencing order at each docket number.  Lee filed post-sentence motions claiming that the verdicts were against the weight of the evidence.   By Order dated September 8, 2018, the trial court denied Lee's post-sentence motions.  These appeals followed.[3]  Both Lee and the trial court complied with Pa.R.A.P. 1925.

Lee raises the following issues:

I.     The verdict issued by the jury is against the weight of the evidence produced at trial and the verdict should be overturned and an order for a new trial should be issued.

A. The only direct evidence of [Lee's] alleged abuse of his niece [C.M.] (Docket 474-2015) is her own testimony which was in conflict of [Lee's] testimony and the testimony of his mother, Joyce Lee.

---

[3] In filing his appeals in these cases, Lee filed an original notice of appeal signed in blue ink bearing both lower court docket numbers with "475" highlighted in the caption at trial court docket number 475-2015, and subsequently docketed in this Court at No. 1527 MDA 2017.  The notice was then photocopied and filed at trial court docket No. 474-2015, with "474" highlighted in the caption, and subsequently docketed in this Court at No. 1526 MDA 2017.

The notices of appeal filed in these cases were technically not in compliance with the rules since one was merely a copy and each notice contained both docket numbers instead of just the respective, applicable number.  Nonetheless, we will accept them as sufficient to satisfy the requirements of Pa.R.A.P. 341.  A notice was filed with the applicable case number highlighted at each respective trial court docket number.  **Cf. Commonwealth v. Walker**, 2018 WL 2448643 (Pa. 2018) (holding separate notices of appeal must be filed when convictions arise from separate dockets, effective prospectively from June 1, 2018).

B. The only direct evidence of [Lee's] alleged abuse of his [cousin] [W.B.] (Docket 475-2015) is her own testimony which was in conflict of [Lee's] testimony and the testimony of his mother, Joyce Lee and his brother, Duncan Lee.

II. Did the court err by denying [Lee's] request for a new trial because the jury verdict of guilt[y] was against the weight of the evidence?

*See* Lee's Brief at 13.

Lee argues that C.M.'s testimony was not very detailed and was inconsistent. Moreover, the claimed abuse was not reported until three years later. Regarding the evidence in the case involving W.B., Lee argues that the testimony offered by different witnesses was inconsistent and the information conveyed about the circumstances of the incident varied at different points in time. Moreover, Lee claims that W.B.'s mother had motive to fabricate these allegations of abuse. For these reasons, Lee contends his convictions were against the weight of the evidence. We disagree.

When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. ***Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.***
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts,

- 4 -

certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

* * *

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. ***Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.***

***Commonwealth v. Clay***, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added). Absent an abuse of discretion, the trial court's decision will not be disturbed. ***See Commonwealth v. Griffin***, 515 A.2d 865, 869 (Pa. 1986). An abuse of discretion "is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." ***Commonwealth v. West***, 937 A.2d 516, 521 (Pa. Super. 2007) (citation omitted). By contrast, a proper exercise of discretion "conforms to the law and is based on the facts of record." ***Id.***

In denying Lee's motion, the trial court assessed **all** of the evidence presented in this matter. **See** Trial Court Opinion, 9/18/17, at 4-14. Lee, in arguing his motion, only gave credence to his testimony and those that testified on his behalf, his mother and brother, and completely discounted the testimony of the victim's despite the existence of corroborating evidence. The trial court explained:

> Upon review of the evidence presented at trial, we cannot find that the jury's verdict was against the weight of the evidence. Both children were consistent in their reports to the adults

involved. C.M.'s testimony was consistent with her report to her aunt and to Voss [a forensic interviewer]. W.B.'s immediate report to her mother was consistent with what she told Thomas [her father's brother] and then Voss during the CAC [Children's Advocacy Center] interview. The children both used age-appropriate language and descriptions in relating what [Lee] did to them. W.B.'s report was supported by DNA evidence.

[Lee] had a significant interest in the outcome of the trial and the jury was free to consider that interest in weighing his testimony. [Lee's] suggestion that Alicia [W.B.'s mother] put W.B. through the trauma of a sexual assault examination, CAC interview, and trial because she was upset that the [Lee] did not want to engage in a sexual relationship with her was clearly rejected by the jury. There was no motive suggested for C.M. to fabricate the allegations she made other than 'she's a liar.' While neither Joyce Lee nor Duncan Lee ever saw [Lee] alone with C.M., it should go without saying that if the child and [Lee] were alone, neither Joyce nor Duncan Lee were there. Their lack of observation of [Lee] in the act of assaulting C.M. does not disprove the child's allegations.

Trial Court Opinion, 9/18/17, at 4-14. Consequently, the trial court concluded that "[w]e cannot say that the jury's verdict is so contrary to the evidence so as to shock our sense of justice." *Id.* at 15.

In view of the trial court's thorough review of the record and rationale for denying Lee's post-sentence motion, we conclude that the trial court properly exercised its discretion in denying Lee's weight challenge. The parties are directed to attach a copy of that opinion in the event of further proceedings.

Before concluding our analysis, however, we raise *sua sponte*, the legality of Lee's designation as a sexually violent predator (SVP). *See generally*, *Commonwealth v. Muhammed*, 992 A.2d 897 (Pa. Super.

- 6 -

2010).  Regarding the process for designating a convicted criminal defendant an SVP, this Court has summarized:

> In [**Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017)], our Supreme Court held that the registration requirements under SORNA constitute criminal punishment.  [**Id.**] at 1218.  In light of **Muniz**, this Court determined:  "[Under **Apprendi** [**v. New Jersey**, 530 U.S. 466 (2000)] and **Alleyne** [**v. United States**, 570 U.S. 99, (2013)], a factual finding, such as whether a defendant has a mental abnormality or personality disorder that makes him . . . likely to engage in predatory sexually violent offenses, that increases the length of registration must be found beyond a reasonable doubt by the chosen fact-finder." **Commonwealth v. Butler**, 173 A.3d 1212, 1217 (Pa. Super. 2017) (internal quotations and citations omitted). The **Butler** Court further held "section 9799.24(e)(3) of SORNA violates the federal and state constitutions because it increases the criminal penalty to which a defendant is exposed without the chosen fact-finder making the necessary factual findings beyond a reasonable doubt." **Id.** at 1218.  The Court therefore concluded that trial courts no longer can designate convicted defendants as SVPs or hold SVP hearings "until our General Assembly enacts a constitutional designation mechanism." **Id.**  The **Butler** Court directed trial courts to apply only the applicable tier-based registration period, as those periods apply based on the conviction itself, and not due to any additional fact not found, under SORNA's procedures, by the fact-finder.  The Court ultimately reversed the order finding the defendant to be an SVP and remanded to the trial court for the sole purpose of issuing appropriate notice of the defendant's tier-based registration period. **Id.**

**Commonwealth v. Golson**, 2018 WL 2473514 at *7 (Pa. Super. 2018).

Here, Lee was designated an SVP on May 24, 2017.  While this appeal was pending, our Supreme Court decided **Muniz** on July 19, 2017, and this Court decided **Butler** on October 31, 2017.  In light of the holdings of **Muniz**

and **Butler**, as summarized above in **Golson**, Lee's SVP status constitutes and illegal sentence. Thus, we are constrained to vacate that portion of Lee's sentence designating him to be an SVP and remand to the trial court to issue a revised notice to Lee pursuant to 42 Pa.C.S.A. § 9799.23 (governing reporting requirements for sex offenders).

Judgment of sentence affirmed in part, SVP designation vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/17/2018

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

Commonwealth of Pennsylvania : CP-28-CR-474-2015
: CP-28-CR-475-2015
v. :
:
Donovon Neal Lee : Angela R. Krom, Judge

## OPINION

Before the Court is the Post Sentence Motion ("Motion") filed by the defendant on June 1, 2017. Defendant's Motion seeks a new trial and argues that the jury's verdict was against the weight of the evidence. For the reasons that follow, we find the jury's verdict consistent with the weight of the evidence. Accordingly, Defendant's Motion will be denied.

## STATEMENT OF THE CASE

After trial by jury held December 5 and 6, 2016, the defendant was found guilty of one count of indecent assault, a felony of the third degree pursuant to 18 Pa.C.S. §3126(a)(7)(ii),[1]

---

[1] 18 Pa.C.S. §3126 provides:
(a) A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:
 (1) the person does so without the complainant's consent;
 (2) the person does so by forcible compulsion;
 (3) the person does so by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;
 (4) the complainant is unconscious or the person knows that the complainant is unaware that the indecent contact is occurring;
 (5) the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance;
 (6) the complainant suffers from a mental disability which renders the complainant incapable of consent;
 (7) the complainant is less than 13 years of age; or
 (8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

(b) Grading.--Indecent assault shall be graded as follows:
 (1) An offense under subsection (a)(1) or (8) is a misdemeanor of the second degree.
 (2) An offense under subsection (a)(2), (3), (4), (5) or (6) is a misdemeanor of the first degree.

and one count of corruption of minor, also a felony of the third degree pursuant to 18 Pa.C.S. §6301(a)(1)(ii),[2] at docket number CP-28-CR-474-2015 for offenses committed against his young niece, C. M. The defendant was also found guilty of one count of indecent assault, a misdemeanor of the first degree, and one count of corruption of minor, also a misdemeanor of the first degree, at case number CP-28-CR-475-2015, for offenses committed against his young second cousin, W. B.[3] Pursuant to 42 Pa.C.S. §9799.24, the defendant was ordered to undergo a sexual offender assessment to determine if he met the statutory criteria of a sexually violent predator.

On May 24, 2017, after evidentiary hearing, the defendant was determined a sexually violent predator. He was subsequently sentenced to an aggregate period of incarceration of 300 months to 600 months (25 years to 50 years) in a state correctional institution based on the

_____

(3) An offense under subsection (a)(7) is a misdemeanor of the first degree unless any of the following apply, in which case it is a felony of the third degree:
    (i) It is a second or subsequent offense.
    (ii) There has been a course of conduct of indecent assault by the person.
    (iii) The indecent assault was committed by touching the complainant's sexual or intimate parts with sexual or intimate parts of the person.
    (iv) The indecent assault is committed by touching the person's sexual or intimate parts with the complainant's sexual or intimate parts.

[2] 18 Pa.C.S. §6301(a)(1) provides:
    (i) Except as provided in subparagraph (ii), whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

    (ii) Whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree.

[3] Docket numbers CP-28-CR-474-2015 and CP-28-475-2015 were joined for trial by Order of the Honorable Jeremiah D. Zook, filed December 7, 2015. (Note: Judge Zook's Order appears to be erroneously dated October 7, 2015).

application of 42 Pa.C.S. §9718.2(a)(1) to docket 475-2015 and the defendant's prior indecent assault conviction.[4] Thereafter, the defendant filed the instant Motion.

After having received the defendant's written argument in support of his Motion, and mindful of our obligation to decide the defendant's post sentence motion pursuant to the timeline set forth in Pa.R.Crim.P. 720 (B)(3)(a), we address the defendant's claims as follows:

## DISCUSSION

The defendant claims the verdict returned by the jury is against the weight of the evidence produced at trial and should be overturned and a new trial ordered because:

> The only direct evidence of the defendant's alleged abuse of his niece [sic] (docket 474-2015) is her own testimony which was in conflict of defendant's testimony and the testimony of his mother, Joyce Lee.

> The only direct evidence of the defendant's alleged abuse of his niece (docket 475-2015) is her own testimony which was in conflict of defendant's testimony and the testimony of his mother, Joyce Lee and his brother, Duncan Lee.

Post Sentence Motion, ¶3.

At the outset we note, "a motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citation omitted). The law is well-settled that a motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court and a new trial should not be granted merely because of a conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). "Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000). "Rather, the

---

[4] Defendant was convicted of indecent assault at docket CP-28-CR-954-2013 and sentenced on May 14, 2014.

3

role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Clay*, 64 A.3d 1054-55 (citation omitted). A new trial should be awarded only when "the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* at 1055.

Certainly, "[t]he weight of the evidence is exclusively for the finder of fact [,] who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015), *appeal denied*, 138 A.3d 4 (Pa. 2016), quoting *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995). It is the jury, as the fact finder that has the duty to determine the credibility of the testimony and evidence presented at trial. *Talbert*, 129 A.3d at 546. Finally,

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Leatherby*, 116 A.3d 73, 82 (Pa. Super. 2015).

Understanding these legal principles, we must review the evidence presented at trial in each docket.

C. M. testified via contemporaneous alternative method.[5] C. M. told the jury that she is now 14 years old and in the eighth grade. She also told the jury that she was in court because,

---

[5] The Honorable Douglas W. Herman, now Senior Judge, issued an Opinion and Order on December 18, 2014, granting the Commonwealth's Tender Years Motion and Motion for Closed-Circuit Testimony, permitting C. M. and W. B. to testify via contemporaneous alternative method at both the preliminary hearing and at trial. See 42 Pa.C.S. §5985.

"my uncle had molested me." N.T. 12/5/16 at 42. The child explained that her uncle, Donovan Lee, touched her inappropriately with his hands in her "areas" "more than once." *Id.* When asked if her "areas" were "the part that you go pee out of?" C. M. responded, "Yes." *Id.* She was around three or four years old when it started and in fourth or fifth grade when it stopped happening. N.T. 12/5/16 at 42-43. He touched her under her clothes. He rubbed her and it hurt most of the time, "[l]ike he would just do it too hard." N.T. 12/5/16 at 43.

C. M. recalled the first time it happened, they were in the defendant's bedroom at 429 Ramsey Avenue in Chambersburg and he was changing her diaper. N.T. 12/5/16 at 43-44, 54. They were on the floor, by the door. N.T. 12/5/16 at 54. Her grandmother wasn't up yet. *Id.* On that occasion his hand stayed on the outside of her body. C. M. testified that her brothers, who are older than her but too young at the time to understand what was happening to her, were in the room at the time. N.T. 12/5/16 at 55. She also described her oldest brother, now seventeen years old, as having a mental disability and not comprehending things "as well as we do." *Id.*

C. M. explained that the incidents happened in several rooms of the defendant's home, including his bedroom and the hallway outside of the bathroom. N.T. 12/5/16 at 44-45, 52. In response to questions from the defendant's counsel, C.M. explained that she was at her grandmother's house every other weekend because her mother worked. N.T. 12/5/16 at 53. Her grandmother watched C.M. and her brothers. *Id.* They spent the night. *Id.* There were a few times when the defendant's younger brother, Duncan, was also there. *Id.* Duncan never touched her, but he never did anything to make the defendant stop. *Id.* C.M. told the defendant to stop, but he wouldn't. N.T. 12/5/16 at 46. Eventually, she stopped going to her grandma's house and would go to her aunt's, Anita Barnhart's, house, instead. *Id.*

5

C.M. first told her aunt about the assaults two years ago when her aunt asked her why she didn't want to go to her grandmother's house anymore. N.T. 12/5/16 at 46-47. The child eventually explained that she didn't want to go because Donovon was there. When her aunt asked what happened, she told her. N.T. 12/5/16 at 47. C.M. testified, "I told her Donovon would touch me inappropriately." *Id.* The pair told C.M.'s mother the following day. *Id.* C.M. explained her delay in reporting, "Like I feel like—I would feel like people would blame me because I didn't tell. I didn't tell, like sooner when it was happening, when I could have stopped it." N.T. 12/5/16 at 48. After reporting the assaults to her mother, C.M. spoke with someone at the Children's Advocacy Center. N.T. 12/5/16 at 49. C.M. learned about the allegations by W.B. after she reported what happened to her to her aunt. N.T. 12/5/16 at 50, 52.

C. M.'s great-aunt, Anita Barnhart ("Anita"), testified that she saw C. M. about every other weekend in September of 2014. She and C. M. were very close at the time and remain so. N.T. 12/5/16 at 83. Anita identified the defendant and explained that he is her nephew. N.T. 12/5/16 at 84. In 2012, the defendant lived with his mother, Joyce Lee, on Ramsey Avenue in Chambersburg. *Id.* C. M.'s mother worked two jobs and Joyce was taking care of the children. N.T. 12/5/16 at 86-87.

On September 19, 2014, C. M. was at Anita's house. Anita had been trying to figure out why C. M. was refusing to go to her grandmother's house, so she asked her. N.T. 12/5/16 at 87. At first, the child did not reply. When Anita looked at C. M. again, the child was crying. N.T. 12/5/16 at 88. She told C. M. that she could tell her what was going on, that she would do whatever she could to get it stopped. *Id.* C. M. then told her that the defendant touched her in her private areas. N.T. 12/5/16 at 88. Anita then stopped the conversation because she knew she had to involve C. M.'s mother. *Id.* Anita described C. M. as very scared of the defendant. *Id.*

6

Anita testified that when C. M. told her about what the defendant did, she did not know about what happened to W. B. N.T. 12/5/16 at 90-91.

Betty George ("Betty"), C. M.'s mother, testified that C. M. was born in September, 2002. N.T. 12/5/16 at 92. The defendant is her brother and C. M.'s uncle. N.T. 12/5/16 at 92-93. From 2006 through 2012, C. M. stayed with Betty's family while she worked; specifically, C. M. stayed with Joyce Lee on Ramsey Avenue in Chambersburg. N.T. 12/5/16 at 93. She became aware of C. M.'s allegations when her aunt, Anita Barnhart, called her at work. *Id.* Betty did not contact the police until the following day; she told her mother first. N.T. 12/5/16 at 97. She learned about the allegations involving W. B. after C. M. came forward, when she received a call from the police. N.T. 12/5/16 at 94. When the subject of the defendant comes up, C. M. is "very scared, kind of by herself, like, withdrawn from people." N.T. 12/5/16 at 95. The case has been hard on the family. Betty does not have a relationship with her mother or brothers anymore. N.T. 12/5/16 at 96.

Alicia Barnhart ("Alicia"), mother of W. B., identified the defendant and explained that he is her husband Patrick's cousin.[6] N.T. 12/5/16 at 60. W. B. was born in April, 2009, making the child seven years old at the time of trial. N.T. 12/5/16 at 59. During the relevant time period, the Barnhart family, including Alicia, Patrick, their children, and Patrick's parents, all lived together in a three-story home on King Street in Chambersburg. N.T. 12/5/16 at 64-65. Alicia and her husband shared a bedroom on the third floor; the children's bedroom, including W. B.'s, was on the second floor. *Id.* Prior to the September 17, 2014 incident, Alicia spent time

---

[6] Alicia identified Commonwealth's Exhibit 1, a family tree diagram showing Patrick's family including the defendant; the defendant's parents, Joyce and James Lee; the defendant's aunt by marriage, Anita Barnhart; and Betty (Lee) George, the defendant's sister and C. M.'s mother. W. B.'s grandfather, Patrick Barnhart, Sr., is the brother of Joyce Lee, making W.B. and the defendant second cousins. N.T. 12/5/16 at 61-63.

7

with the defendant at her home on King Street "a couple of times a week" watching movies, playing card games and playing video games. N.T. 12/5/16 at 63-64.

On September 17, 2014, around 6:00-7:00 p.m., the defendant was at Alicia's house. N.T. 12/5/16 at 66. Alicia's in-laws, as well as her children were home, as well. N.T. 12/5/16 at 77. Alicia asked the defendant to go to her bedroom to retrieve something for her. N.T. 12/5/16 at 67. W. B. came downstairs to the living room where Alicia was. When Alicia asked W. B. where she had been, W. B. told her that the defendant had taken her to Alicia's room. N.T. 12/5/16 at 68. Alicia asked W. B. if the defendant touched her; W. B. said that he touched her "bug" with his hand, licked her "bug," and pressed his "bug" against her "bug." N.T. 12/5/16 at 68. Alicia explained that when W. B. says "bug" she is referring to her vagina. N.T. 12/5/16 at 69. W. B. described the defendant's "bug" as long, round, and hard. *Id.* Alicia obtained a picture of an adult male penis from Yahoo images, showed it to W. B., and asked her if that's what it looked like. W. B. said, "yes." N.T. 12/5/16 at 70.

Alicia asked her husband's brother, Thomas Barnhart, who returned home just after the incident, to question W. B. to see if she told him the same thing. N.T. 12/5/16 at 71, 80. He did, and reported that "everything lined up." *Id.* She then asked her brother-in-law to call her husband, who was at work. *Id.* Alicia did not say anything to the defendant at that time. N.T. 12/5/16 at 70-71.

Alicia and her husband took the child to Meritus Medical Center in Hagerstown. N.T. 12/5/16 at 72. W. B. did not change her clothes or take a bath prior to going to the hospital, nor did Alicia wipe the child's vaginal area in any way. *Id.* At Meritus, the medical personnel took a report, took pictures of W. B. and her underwear, collected W. B.'s underwear, performed an examination, and collected swabs. N.T. 12/5/16 at 73-74. At the time, the child was very scared.

8

*Id.* at 74. Eventually, the police asked that W. B. be interviewed at the Children's Advocacy Center in Gettysburg. *Id.*

On cross-examination Alicia explained that she didn't have a choice in calling the police because the medical professionals already had; but, she was not reluctant to do so. N.T. 12/5/16 at 82. She was sure something had happened. *Id.* Since the incident, W. B., who used to be a sweet, loving little girl, has really bad anger and attitude issues. N.T. 12/5/16 at 75. W. B. is uneasy when she has to talk about the defendant, says she's scared, and doesn't want to see him ever again. *Id.*

Like C. M., W. B. also testified by contemporaneous alternative method. W. B. was seven years old at the time of trial. N.T. 12/5/16 at 25. After examination, the Court found W. B. competent to testify. N.T. 12/5/16 at 26. The child confirmed she has an older sister and a younger brother and used to live in a house with her grandparents, parents, sister and brother. N.T. 12/5/16 at 30-32. Uncle Tommy, lived there, too. N.T. 12/5/16 at 32-33. Her parents' bedroom was in the attic, where she was not allowed to go. N.T. 12/5/16 at 33. Donovon took her up there and teased her on the bed with her blanket. N.T. 12/5/16 at 34. She was lying down. N.T. 12/5/16 at 35. She did not like being up there with him because she wasn't allowed to be there. *Id.* W. B. testified that she did not remember what happened in her parents' room, "[b]ecause I'm just nervous today." N.T. 12/5/16 at 36.

Rebecca Voss, a forensic interviewer employed by the Over the Rainbow Children's Advocacy Center, has been trained to conduct forensic interviews on children. N.T. 12/5/16 at 98-100. Voss explained her role and responsibility in maintaining neutrality throughout the interview. N.T. 12/5/16 at 100-101. Voss interviewed W. B. on September 22, 2014, and C. M. on September 24, 2014. The interviews were recorded and played for the jury. See

9

Commonwealth's Exhibits 2 (interview of W. B.) and 3 (recorded interview of C. M.). Voss confirmed the videos were accurate depictions of the interviews.

In the video W. B. related, *inter alia*, that she went to a doctor because Donovan touched her. She told her mother that he took her to her mother and father's room. He took her clothes off, touched her "bug" with part of his tongue, and licked her. See Commonwealth's Exhibit 2.

In her interview, C. M. told Voss, *inter alia*, the defendant touched her inappropriately when she was little, starting when she was still in diapers and continuing until she was nine or ten. C. M. explained that the defendant touched her "butt" and "private" with his hand, underneath and on top of her clothes. He pulled her clothes down. She tried to tell him to stop, but he never would. It kind of hurt. He would do it really hard. She was too scared to tell anyone. See Commonwealth's Exhibit 3.

Detective Sergeant Matthew Cody ("Det. Cody") of the Chambersburg Police Department testified that he retrieved from Meritus the sexual assault examination kit collected from W. B. on September 18, 2014, and placed it in a sealed evidence envelope. N.T. 12/5/16 at 118. See Commonwealth's Exhibit 8. The kit was transported to the Pennsylvania State Police lab for analysis. Det. Cody also used a buccal swab to collect DNA material from W. B. on July 9, 2015. See Commonwealth's Exhibit 9. The buccal swab was sent to the lab for DNA analysis. N.T. 12/5/16 at 129-130. Det. Cody also obtained a search warrant for the defendant's DNA and then used a buccal swab to collect DNA from the defendant and sent the swab to the lab for analysis. N.T. 12/5/16 at 130-131. See Commonwealth's Exhibit 10, 11. Det. Cody's testimony established the chain of custody for the buccal swabs, as well. N.T. 12/5/16 at 129-138. On cross-examination Det. Cody testified that he did not submit the sexual assault kit to the lab until March of 2015 and did not collect the defendant's DNA until July of 2015. N.T.

10

12/5/16 at 141. There was no reason for the delay; he obtained the search warrant for the defendant's DNA shortly after he learned from the lab that there was DNA material identified through their analysis. To obtain the defendant's DNA through the use of a search warrant, he needed a basis to do so. N.T. 12/5/16 at 141-142.

Det. Cody also accompanied W. B. and her family to the Children's Advocacy Center ("CAC") and observed Voss' interview with W. B. N.T. 12/5/16 at 124. After the interview, Det. Cody learned that there may be a second victim, C. M. N.T. 12/5/16 at 125. He spoke with Betty George and then scheduled and attended a CAC interview with C. M. N.T. 12/5/16 at 126. Because nearly two years that had elapsed from the last time C. M. indicated she had been assaulted, C. M. did not undergo a medical examination. N.T. 12/5/16 at 127.

As part of his investigation, Det. Cody learned the defendant was born in January, 1991, making him 21 years old the last time he assaulted C. M. and 23 when he assaulted W. B. N.T. 12/5/16 at 128. Det. Cody did not interview C. M.'s grandparents or her father. He did not interview Duncan Lee, the defendant's brother. He also did not interview W. B.'s grandparents. N.T. 12/5/16 at 139-140.

Andrea Blythe ("Blythe"), a licensed pediatric forensic nurse examiner testified that in September, 2014, she was a sexual assault nurse examiner at Meritus Medical Center. N.T. 12/5/16 at 145-146. She performed the sexual assault examination on W. B. on September 18, 2014, at 1:00 a.m. at Meritus. N.T. 12/5/16 at 149. Blythe collected the child's underwear and a swab from her genital area. N.T. 12/5/16 at 153-154. See Commonwealth's Exhibit 8.

The Commonwealth's final witnesses were Deborah Zamboni and Lauren Force, forensic scientists employed by the Pennsylvania State Police Laboratory. Zamboni testified regarding the testing for seminal material she performed on the underwear and external genitalia swab

11

collected from W. B. N.T. 12/6/16 at 11-13. Her analysis revealed the presence of seminal material on the underwear and external genitalia swab. N.T. 12/6/16 at 19-20. Zamboni then forwarded a cutting from the underwear, the external genitalia swab, and the buccal swabs from the defendant and W. B. to the DNA lab for further analysis. N.T. 12/6/16 at 23-24. The DNA analysis was performed by Force, who explained the process in detail. Force concluded that neither the defendant nor any of his paternally related male relatives could be excluded as contributors to the DNA found on W. B.'s underwear. N.T. 12/6/16 at 41, 43-44.

Duncan Lee ("Lee"), the defendant's younger brother, testified that he has lived at 429 Ramsey Avenue, Chambersburg during all times (relevant to this case). N.T. 12/6/16 at 50. Lee confirmed that from 2006 to 2008, C. M. was at his house "a good bit" during the week and on weekends when her mother worked. N.T. 12/6/16 at 51. C. M. stayed in his sister's room. The defendant did not live there the entire time. N.T. 12/6/16 at 53. Lee never witnessed anything that C. M. alleged happened, nor did he witness the defendant alone with C. M. (although conceded that if they were alone, he would not have been there). N.T. 12/6/16 at 53, 55. Lee confirmed that the defendant and Alicia, as well as the defendant and W. B., got along pretty well, and in fact, until W. B. made allegations against the defendant, there were never any problems between any of the people involved. N.T. 12/6/16 at 54-55.

Joyce Lee ("Joyce"), the defendant's mother and C. M.'s grandmother, confirmed that in 2006 through 2012, both of her sons lived with her and her husband; however, the defendant was in foster care and a juvenile placement from late 2006 through 2009. N.T. 12/6/16 at 58. As to the dates he was out of the house she explained, "I can't give you an exact. I just know it was late 2006 to probably 2007, maybe, 2008." N.T. 12/6/16 at 60. She never witnessed the defendant alone with C. M. and never observed C. M. to be afraid of the defendant. *Id.* C. M.

12

never slept in the same room as the defendant. *Id.* She never saw any inappropriate behavior between the defendant and C. M. or W. B. N.T. 12/6/16 at 60. Joyce alleged C. M. lied about the allegations. N.T. 12/6/16 at 66.

The defendant testified on his own behalf and explained that from 2006 to 2009 he lived at the Ramsey Avenue address on and off. N.T. 12/6/16 at 68. From 2009 to 2012 he was "mostly living other places, on and off, at different houses with other people." *Id.* After he turned 18 in 2009 he bounced around different places. N.T. 12/6/16 at 69. He admitted convictions for retail thefts in 2011 when he was irresponsible. N.T. 12/6/16 at 70.

The defendant acknowledged that C. M. and her bothers stayed every other weekend. He was there "a little bit," "once in a while." N.T. 12/6/16 at 70. He tried to avoid being around them and left to hang out with his friends. N.T. 12/6/16 at 71. The defendant denied C. M.'s allegations, testifying that the incidents did not occur and that he was never alone with C. M. N.T. 12/6/16 at 72. The defendant reported C. M. has been known to lie. N.T. 12/6/16 at 80.

The defendant further testified that he and Alicia were friends for 18 years and had a sexual relationship. N.T. 12/6/16 at 73-75. He testified to his activities on September 17, 2014, and denied being at Alicia's and W. B.'s house that day. N.T. 12/6/16 at 76-77. He believes W. B. lied and was coached by her mother because a week prior he told Alicia that he was not going to have sex with her anymore. N.T. 12/6/16 at 79. The defendant believes Alicia put her child up to the lie because she was jealous. N.T. 12/6/16 at 80. His DNA got in the child's underwear because he had sex with her mother in their house. N.T. 12/6/16 at 81.

In rebuttal the Commonwealth called Thomas Barnhart ("Thomas"), W. B.'s uncle. Thomas testified that he saw the defendant at the 379 East King Street house where Alicia and W. B. live on September 17, 2014. N.T. 12/6/16 at 82-83. He came home from school about

13

5:00 p.m. Alicia told him what W. B. said happened and asked him to ask W. B. what happened to confirm. He did and W. B. told him the same thing. N.T. 12/6/16 at 83. He saw the defendant come down the stairs about a half hour or so after he got home. N.T. 12/6/16 at 84. At that time he was aware of W. B.'s accusations, but did not confront the defendant. *Id.*

Upon review of the evidence presented at trial, we cannot find that the jury's verdict was against the weight of the evidence. Both children were consistent in their reports to the adults involved. C. M.'s testimony was consistent with her report to her aunt and to Voss. W. B.'s immediate report to her mother was consistent with what she told Thomas and then Voss during the CAC interview. The children both used age-appropriate language and descriptions in relating what the defendant did to them. W.B.'s report was supported by DNA evidence.

The defendant had a significant interest in the outcome of the trial and the jury was free to consider that interest in weighing his testimony. The defendant's suggestion that Alicia put W. B. through the trauma of a sexual assault examination, CAC interview, and trial because she was upset that the defendant did not want to engage in a sexual relationship with her was clearly rejected by the jury. There was no motive suggested for C. M. to fabricate the allegations she made other than "she's a liar." While neither Joyce Lee nor Duncan Lee ever saw the defendant alone with C. M., it should go without saying that if the child and the defendant were alone, neither Joyce nor Lee were there. Their lack of observation of the defendant in the act of assaulting C. M. does not disprove the child's allegations.

CONCLUSION

The jury, as the finder of fact, is required to make credibility determinations. The jury was free to believe all, part, or none of the evidence presented by the Commonwealth and the

14

defendant. In this case, the jury's verdict suggests that the jury made credibility determinations in favor of the Commonwealth's witnesses. We cannot say that the jury's verdict is so contrary to the evidence so as to shock our sense of justice.

An Order follows.

## IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-28-CR-474-2015 ✓ |
| | : | CP-28-CR-475-2015 ✓ |
| v. | : | |
| | : | |
| Donovon Neal Lee | : | Angela R. Krom, Judge |

## ORDER OF COURT

NOW THIS _8th_ day of September, 2017, upon consideration of the Defendant's Post-Sentence Motion, the record, and the law;

**IT IS HEREBY ORDERED** that for the reasons fully explained in the foregoing Opinion, Defendant's Post-Sentence Motion is **DENIED**.

**THE DEFENDANT IS ADVISED** that he has the right to appeal the denial of his Post-Sentence Motion to the Superior Court of Pennsylvania by filing a written Notice of Appeal within thirty (30) days of date of the entry of this Order. The defendant is further advised that he has the right to the assistance of counsel in the preparation of an appeal. The defendant is also advised that if he is indigent he may qualify to proceed *in forma pauperis*, entitling him to a waiver of filing fees and costs in pursuing an appeal.

*Pursuant to the requirements of Pa.R.Crim.P. 114, the Clerk of Courts shall immediately docket this Order and record in the docket the date it was made. The Clerk shall forthwith furnish a copy of the Order, by mail or personal delivery, to each party or attorney, and shall record in the docket the time and manner thereof.*

By the Court,

_____ J.

Distribution:
Franklin County District Attorney
Brian O. Williams, Esq., Counsel for Defendant